## CALIFORNIA *v.* ACEVEDO

No. 89–1690.   Argued January 8, 1991—Decided May 30, 1991

566

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and SOUTER, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 581. WHITE, J., filed a dissenting opinion, *post*, p. 585. STEVENS, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 585.

*Robert M. Foster*, Supervising Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs were *John K. Van de Kamp*, Attorney General, *Richard B. Iglehart*, Chief Assistant Attorney General, *Harley D. Mayfield*, Senior Assistant Attorney General, and *Frederick R. Millar*, Supervising Deputy Attorney General.

*Frederick Westcott Anderson* argued the cause for respondent. With him on the brief was *Jan Walls Anderson*.

JUSTICE BLACKMUN delivered the opinion of the Court.

This case requires us once again to consider the so-called "automobile exception" to the warrant requirement of the Fourth Amendment and its application to the search of a closed container in the trunk of a car.

I

On October 28, 1987, Officer Coleman of the Santa Ana, Cal., Police Department received a telephone call from a fed-

eral drug enforcement agent in Hawaii. The agent informed Coleman that he had seized a package containing marijuana which was to have been delivered to the Federal Express Office in Santa Ana and which was addressed to J. R. Daza at 805 West Stevens Avenue in that city. The agent arranged to send the package to Coleman instead. Coleman then was to take the package to the Federal Express office and arrest the person who arrived to claim it.

Coleman received the package on October 29, verified its contents, and took it to the Senior Operations Manager at the Federal Express office. At about 10:30 a.m. on October 30, a man, who identified himself as Jamie Daza, arrived to claim the package. He accepted it and drove to his apartment on West Stevens. He carried the package into the apartment.

At 11:45 a.m., officers observed Daza leave the apartment and drop the box and paper that had contained the marijuana into a trash bin. Coleman at that point left the scene to get a search warrant. About 12:05 p.m., the officers saw Richard St. George leave the apartment carrying a blue knapsack which appeared to be half full. The officers stopped him as he was driving off, searched the knapsack, and found 1½ pounds of marijuana.

At 12:30 p.m., respondent Charles Steven Acevedo arrived. He entered Daza's apartment, stayed for about 10 minutes, and reappeared carrying a brown paper bag that looked full. The officers noticed that the bag was the size of one of the wrapped marijuana packages sent from Hawaii. Acevedo walked to a silver Honda in the parking lot. He placed the bag in the trunk of the car and started to drive away. Fearing the loss of evidence, officers in a marked police car stopped him. They opened the trunk and the bag, and found marijuana.[1]

---

[1] When Officer Coleman returned with a warrant, the apartment was searched and bags of marijuana were found there. We are here concerned, of course, only with what was discovered in the automobile.

Respondent was charged in state court with possession of marijuana for sale, in violation of Cal. Health & Safety Code Ann. § 11359 (West Supp. 1991). App. 2. He moved to suppress the marijuana found in the car. The motion was denied. He then pleaded guilty but appealed the denial of the suppression motion.

The California Court of Appeal, Fourth District, concluded that the marijuana found in the paper bag in the car's trunk should have been suppressed. 216 Cal. App. 3d 586, 265 Cal. Rptr. 23 (1990). The court concluded that the officers had probable cause to believe that the paper bag contained drugs but lacked probable cause to suspect that Acevedo's car, itself, otherwise contained contraband. Because the officers' probable cause was directed specifically at the bag, the court held that the case was controlled by *United States* v. *Chadwick*, 433 U. S. 1 (1977), rather than by *United States* v. *Ross*, 456 U. S. 798 (1982). Although the court agreed that the officers could seize the paper bag, it held that, under *Chadwick*, they could not open the bag without first obtaining a warrant for that purpose. The court then recognized "the anomalous nature" of the dichotomy between the rule in *Chadwick* and the rule in *Ross*. 216 Cal. App. 3d, at 592, 265 Cal. Rptr., at 27. That dichotomy dictates that if there is probable cause to search a car, then the entire car—including any closed container found therein—may be searched without a warrant, but if there is probable cause only as to a container in the car, the container may be held but not searched until a warrant is obtained.

The Supreme Court of California denied the State's petition for review. App. E to Pet. for Cert. 33. On May 14, 1990, JUSTICE O'CONNOR stayed enforcement of the Court of Appeal's judgment pending the disposition of the State's petition for certiorari, and, if that petition were granted, the issuance of the mandate of this Court.

We granted certiorari, 498 U. S. 807 (1990), to reexamine the law applicable to a closed container in an automobile, a

subject that has troubled courts and law enforcement officers since it was first considered in *Chadwick.*

## II

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Contemporaneously with the adoption of the Fourth Amendment, the First Congress, and, later, the Second and Fourth Congresses, distinguished between the need for a warrant to search for contraband concealed in "a dwelling house or similar place" and the need for a warrant to search for contraband concealed in a movable vessel. See *Carroll* v. *United States,* 267 U. S. 132, 151 (1925). See also *Boyd* v. *United States,* 116 U. S. 616, 623–624 (1886). In *Carroll,* this Court established an exception to the warrant requirement for moving vehicles, for it recognized

> "a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." 267 U. S., at 153.

It therefore held that a warrantless search of an automobile, based upon probable cause to believe that the vehicle contained evidence of crime in the light of an exigency arising out of the likely disappearance of the vehicle, did not contravene the Warrant Clause of the Fourth Amendment. See *id.,* at 158–159.

The Court refined the exigency requirement in *Chambers* v. *Maroney,* 399 U. S. 42 (1970), when it held that the existence of exigent circumstances was to be determined at the time the automobile is seized. The car search at issue in

*Chambers* took place at the police station, where the vehicle was immobilized, some time after the driver had been arrested. Given probable cause and exigent circumstances at the time the vehicle was first stopped, the Court held that the later warrantless search at the station passed constitutional muster. The validity of the later search derived from the ruling in *Carroll* that an immediate search without a warrant at the moment of seizure would have been permissible. See *Chambers*, 399 U. S., at 51. The Court reasoned in *Chambers* that the police could search later whenever they could have searched earlier, had they so chosen. *Id.*, at 51–52. Following *Chambers*, if the police have probable cause to justify a warrantless seizure of an automobile on a public roadway, they may conduct either an immediate or a delayed search of the vehicle.

In *United States* v. *Ross*, 456 U. S. 798, decided in 1982, we held that a warrantless search of an automobile under the *Carroll* doctrine could include a search of a container or package found inside the car when such a search was supported by probable cause. The warrantless search of Ross' car occurred after an informant told the police that he had seen Ross complete a drug transaction using drugs stored in the trunk of his car. The police stopped the car, searched it, and discovered in the trunk a brown paper bag containing drugs. We decided that the search of Ross' car was not unreasonable under the Fourth Amendment: "The scope of a warrantless search based on probable cause is no narrower—and no broader—than the scope of a search authorized by a warrant supported by probable cause." *Id.*, at 823. Thus, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.*, at 825. In *Ross*, therefore, we clarified the scope of the *Carroll* doctrine as properly including a "probing search" of compartments and containers within the automobile so long as the search is supported by probable cause. *Id.*, at 800.

In addition to this clarification, *Ross* distinguished the *Carroll* doctrine from the separate rule that governed the search of closed containers. See 456 U. S., at 817. The Court had announced this separate rule, unique to luggage and other closed packages, bags, and containers, in *United States* v. *Chadwick*, 433 U. S. 1 (1977). In *Chadwick*, federal narcotics agents had probable cause to believe that a 200-pound double-locked footlocker contained marijuana. The agents tracked the locker as the defendants removed it from a train and carried it through the station to a waiting car. As soon as the defendants lifted the locker into the trunk of the car, the agents arrested them, seized the locker, and searched it. In this Court, the United States did not contend that the locker's brief contact with the automobile's trunk sufficed to make the *Carroll* doctrine applicable. Rather, the United States urged that the search of movable luggage could be considered analogous to the search of an automobile. 433 U. S., at 11–12.

The Court rejected this argument because, it reasoned, a person expects more privacy in his luggage and personal effects than he does in his automobile. *Id.*, at 13. Moreover, it concluded that as "may often not be the case when automobiles are seized," secure storage facilities are usually available when the police seize luggage. *Id.*, at 13, n. 7.

In *Arkansas* v. *Sanders*, 442 U. S. 753 (1979), the Court extended *Chadwick*'s rule to apply to a suitcase actually being transported in the trunk of a car. In *Sanders*, the police had probable cause to believe a suitcase contained marijuana. They watched as the defendant placed the suitcase in the trunk of a taxi and was driven away. The police pursued the taxi for several blocks, stopped it, found the suitcase in the trunk, and searched it. Although the Court had applied the *Carroll* doctrine to searches of integral parts of the automobile itself, (indeed, in *Carroll*, contraband whiskey was in the upholstery of the seats, see 267 U. S., at 136), it did not extend the doctrine to the warrantless search of personal lug-

gage "merely because it was located in an automobile lawfully stopped by the police." 442 U. S., at 765. Again, the *Sanders* majority stressed the heightened privacy expectation in personal luggage and concluded that the presence of luggage in an automobile did not diminish the owner's expectation of privacy in his personal items. *Id.*, at 764–765. Cf. *California* v. *Carney*, 471 U. S. 386 (1985).

In *Ross*, the Court endeavored to distinguish between *Carroll*, which governed the *Ross* automobile search, and *Chadwick*, which governed the *Sanders* automobile search. It held that the *Carroll* doctrine covered searches of automobiles when the police had probable cause to search an entire vehicle, but that the *Chadwick* doctrine governed searches of luggage when the officers had probable cause to search only a container within the vehicle. Thus, in a *Ross* situation, the police could conduct a reasonable search under the Fourth Amendment without obtaining a warrant, whereas in a *Sanders* situation, the police had to obtain a warrant before they searched.

JUSTICE STEVENS is correct, of course, that *Ross* involved the scope of an automobile search. See *post*, at 592. *Ross* held that closed containers encountered by the police during a warrantless search of a car pursuant to the automobile exception could also be searched. Thus, this Court in *Ross* took the critical step of saying that closed containers in cars could be searched without a warrant because of their presence within the automobile. Despite the protection that *Sanders* purported to extend to closed containers, the privacy interest in those closed containers yielded to the broad scope of an automobile search.

## III

The facts in this case closely resemble the facts in *Ross*. In *Ross*, the police had probable cause to believe that drugs were stored in the trunk of a particular car. See 456 U. S., at 800. Here, the California Court of Appeal concluded that the police had probable cause to believe that respondent was

carrying marijuana in a bag in his car's trunk.[2] 216 Cal. App. 3d, at 590, 265 Cal. Rptr., at 25. Furthermore, for what it is worth, in *Ross*, as here, the drugs in the trunk were contained in a brown paper bag.

This Court in *Ross* rejected *Chadwick*'s distinction between containers and cars. It concluded that the expectation of privacy in one's vehicle is equal to one's expectation of privacy in the container, and noted that "the privacy interests in a car's trunk or glove compartment may be no less than those in a movable container." 456 U. S., at 823. It also recognized that it was arguable that the same exigent circumstances that permit a warrantless search of an automobile would justify the warrantless search of a movable container. *Id.*, at 809. In deference to the rule of *Chadwick* and *Sanders*, however, the Court put that question to one side. *Id.*, at 809–810. It concluded that the time and expense of the warrant process would be misdirected if the police could search every cubic inch of an automobile until they discovered a paper sack, at which point the Fourth Amendment required them to take the sack to a magistrate for permission to look inside. We now must decide the question deferred in *Ross*: whether the Fourth Amendment requires the police to obtain a warrant to open the sack in a movable vehicle simply because they lack probable cause to search the entire car. We conclude that it does not.

## IV

Dissenters in *Ross* asked why the suitcase in *Sanders* was "more private, less difficult for police to seize and store, or in

---

[2] Although respondent now challenges this holding, we decline to second-guess the California courts, which have found probable cause. Respondent did not raise the probable-cause question in his Brief in Opposition nor did he cross-petition for resolution of the issue. He also did not raise the point in a cross-petition to the Supreme Court of California. We therefore do not consider the issue here. See *Lytle* v. *Household Mfg., Inc.*, 494 U. S. 545, 551, n. 3 (1990); *Heckler* v. *Campbell*, 461 U. S. 458, 468–469, n. 12 (1983).

any other relevant respect more properly subject to the warrant requirement, than a container that police discover in a probable-cause search of an entire automobile?" *Id.*, at 839–840. We now agree that a container found after a general search of the automobile and a container found in a car after a limited search for the container are equally easy for the police to store and for the suspect to hide or destroy. In fact, we see no principled distinction in terms of either the privacy expectation or the exigent circumstances between the paper bag found by the police in *Ross* and the paper bag found by the police here. Furthermore, by attempting to distinguish between a container for which the police are specifically searching and a container which they come across in a car, we have provided only minimal protection for privacy and have impeded effective law enforcement.

The line between probable cause to search a vehicle and probable cause to search a package in that vehicle is not always clear, and separate rules that govern the two objects to be searched may enable the police to broaden their power to make warrantless searches and disserve privacy interests. We noted this in *Ross* in the context of a search of an entire vehicle. Recognizing that under *Carroll*, the "entire vehicle itself . . . could be searched without a warrant," we concluded that "prohibiting police from opening immediately a container in which the object of the search is most likely to be found and instead forcing them first to comb the entire vehicle would actually exacerbate the intrusion on privacy interests." 456 U. S., at 821, n. 28. At the moment when officers stop an automobile, it may be less than clear whether they suspect with a high degree of certainty that the vehicle contains drugs in a bag or simply contains drugs. If the police know that they may open a bag only if they are actually searching the entire car, they may search more extensively

than they otherwise would in order to establish the general probable cause required by *Ross*.

Such a situation is not farfetched. In *United States* v. *Johns*, 469 U. S. 478 (1985), Customs agents saw two trucks drive to a private airstrip and approach two small planes. The agents drew near the trucks, smelled marijuana, and then saw in the backs of the trucks packages wrapped in a manner that marijuana smugglers customarily employed. The agents took the trucks to headquarters and searched the packages without a warrant. *Id.*, at 481. Relying on *Chadwick*, the defendants argued that the search was unlawful. *Id.*, at 482. The defendants contended that *Ross* was inapplicable because the agents lacked probable cause to search anything but the packages themselves and supported this contention by noting that a search of the entire vehicle never occurred. *Id.*, at 483. We rejected that argument and found *Chadwick* and *Sanders* inapposite because the agents had probable cause to search the entire body of each truck, although they had chosen not to do so. *Id.*, at 482–483. We cannot see the benefit of a rule that requires law enforcement officers to conduct a more intrusive search in order to justify a less intrusive one.

To the extent that the *Chadwick-Sanders* rule protects privacy, its protection is minimal. Law enforcement officers may seize a container and hold it until they obtain a search warrant. *Chadwick*, 433 U. S., at 13. "Since the police, by hypothesis, have probable cause to seize the property, we can assume that a warrant will be routinely forthcoming in the overwhelming majority of cases." *Sanders*, 442 U. S., at 770 (dissenting opinion). And the police often will be able to search containers without a warrant, despite the *Chadwick-Sanders* rule, as a search incident to a lawful arrest. In *New York* v. *Belton*, 453 U. S. 454 (1981), the Court said:

"[W]e hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.

"It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment." *Id.*, at 460 (footnote omitted).

Under *Belton*, the same probable cause to believe that a container holds drugs will allow the police to arrest the person transporting the container and search it.

Finally, the search of a paper bag intrudes far less on individual privacy than does the incursion sanctioned long ago in *Carroll*. In that case, prohibition agents slashed the upholstery of the automobile. This Court nonetheless found their search to be reasonable under the Fourth Amendment. If destroying the interior of an automobile is not unreasonable, we cannot conclude that looking inside a closed container is. In light of the minimal protection to privacy afforded by the *Chadwick-Sanders* rule, and our serious doubt whether that rule substantially serves privacy interests, we now hold that the Fourth Amendment does not compel separate treatment for an automobile search that extends only to a container within the vehicle.

## V

The *Chadwick-Sanders* rule not only has failed to protect privacy but also has confused courts and police officers and impeded effective law enforcement. The conflict between the *Carroll* doctrine cases and the *Chadwick-Sanders* line has been criticized in academic commentary. See, *e. g.*, Gardner, Searches and Seizures of Automobiles and Their Contents: Fourth Amendment Considerations in a Post-*Ross* World, 62 Neb. L. Rev. 1 (1983); Latzer, Searching Cars and Their Contents: *United States* v. *Ross*, 18 Crim. L. Bull. 381 (1982); Kamisar, The "Automobile Search" Cases: The Court Does Little to Clarify the "Labyrinth" of Judicial Uncer-

tainty, in 3 The Supreme Court: Trends and Developments 1980–1981, p. 69 (D. Opperman ed. 1982). One leading authority on the Fourth Amendment, after comparing *Chadwick* and *Sanders* with *Carroll* and its progeny, observed: "These two lines of authority cannot be completely reconciled, and thus how one comes out in the container-in-the-car situation depends upon which line of authority is used as a point of departure." 3 W. LaFave, Search and Seizure 53 (2d ed. 1987).

The discrepancy between the two rules has led to confusion for law enforcement officers. For example, when an officer, who has developed probable cause to believe that a vehicle contains drugs, begins to search the vehicle and immediately discovers a closed container, which rule applies? The defendant will argue that the fact that the officer first chose to search the container indicates that his probable cause extended only to the container and that *Chadwick* and *Sanders* therefore require a warrant. On the other hand, the fact that the officer first chose to search in the most obvious location should not restrict the propriety of the search. The *Chadwick* rule, as applied in *Sanders*, has devolved into an anomaly such that the more likely the police are to discover drugs in a container, the less authority they have to search it. We have noted the virtue of providing " " "clear and unequivocal" guidelines to the law enforcement profession.'" *Minnick* v. *Mississippi*, 498 U. S. 146, 151 (1990), quoting *Arizona* v. *Roberson*, 486 U. S. 675, 682 (1988). The *Chadwick-Sanders* rule is the antithesis of a " 'clear and unequivocal' guideline."

JUSTICE STEVENS argues that the decisions of this Court evince a lack of confusion about the automobile exception. See *post*, at 594. The first case cited by the dissent, *United States* v. *Place*, 462 U. S. 696 (1983), however, did not involve an automobile at all. We considered in *Place* the temporary detention of luggage in an airport. Not only was no automobile involved, but the defendant, Place, was waiting

at the airport to board his plane rather than preparing to leave the airport in a car. Any similarity to *Sanders*, in which the defendant was leaving the airport in a car, is remote at best. *Place* had nothing to do with the automobile exception and is inapposite.

Nor does JUSTICE STEVENS' citation of *Oklahoma* v. *Castleberry*, 471 U. S. 146 (1985), support his contention. *Castleberry* presented the same question about the application of the automobile exception to the search of a closed container that we face here. In *Castleberry*, we affirmed by an equally divided court. That result illustrates this Court's continued struggle with the scope of the automobile exception rather than the absence of confusion in applying it.

JUSTICE STEVENS also argues that law enforcement has not been impeded because the Court has decided 29 Fourth Amendment cases since *Ross* in favor of the government. See *post*, at 600. In each of these cases, the government appeared as the petitioner. The dissent fails to explain how the loss of 29 cases below, not to mention the many others which this Court did not hear, did not interfere with law enforcement. The fact that the state courts and the Federal Courts of Appeals have been reversed in their Fourth Amendment holdings 29 times since 1982 further demonstrates the extent to which our Fourth Amendment jurisprudence has confused the courts.

Most important, with the exception of *United States* v. *Johns*, 469 U. S. 478 (1985), and *Texas* v. *Brown*, 460 U. S. 730 (1983), the Fourth Amendment cases cited by the dissent do not concern automobiles or the automobile exception. From *Carroll* through *Ross*, this Court has explained that automobile searches differ from other searches. The dissent fails to acknowledge this basic principle and so misconstrues and misapplies our Fourth Amendment case law.

The *Chadwick* dissenters predicted that the container rule would have "the perverse result of allowing fortuitous circumstances to control the outcome" of various searches. 433

U. S., at 22. The rule also was so confusing that within two years after *Chadwick*, this Court found it necessary to expound on the meaning of that decision and explain its application to luggage in general. *Sanders*, 442 U. S., at 761–764. Again, dissenters bemoaned the "inherent opaqueness" of the difference between the *Carroll* and *Chadwick* principles and noted "the confusion to be created for all concerned." *Id.*, at 771. See also *Robbins* v. *California*, 453 U. S. 420, 425–426 (1981) (listing cases decided by Federal Courts of Appeals since *Chadwick* had been announced). Three years after *Sanders*, we returned in *Ross* to "this troubled area," 456 U. S., at 817, in order to assert that *Sanders* had not cut back on *Carroll*.

Although we have recognized firmly that the doctrine of *stare decisis* serves profoundly important purposes in our legal system, this Court has overruled a prior case on the comparatively rare occasion when it has bred confusion or been a derelict or led to anomalous results. See, *e. g.*, *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274, 288–289 (1977). *Sanders* was explicitly undermined in *Ross*, 456 U. S., at 824, and the existence of the dual regimes for automobile searches that uncover containers has proved as confusing as the *Chadwick* and *Sanders* dissenters predicted. We conclude that it is better to adopt one clear-cut rule to govern automobile searches and eliminate the warrant requirement for closed containers set forth in *Sanders*.

## VI

The interpretation of the *Carroll* doctrine set forth in *Ross* now applies to all searches of containers found in an automobile. In other words, the police may search without a warrant if their search is supported by probable cause. The Court in *Ross* put it this way:

"The scope of a warrantless search of an automobile . . . is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the ob-

ject of the search and the places in which there is probable cause to believe that it may be found." 456 U. S., at 824.

It went on to note: "Probable cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does not justify a search of the entire cab." *Ibid.* We reaffirm that principle. In the case before us, the police had probable cause to believe that the paper bag in the automobile's trunk contained marijuana. That probable cause now allows a warrantless search of the paper bag. The facts in the record reveal that the police did not have probable cause to believe that contraband was hidden in any other part of the automobile and a search of the entire vehicle would have been without probable cause and unreasonable under the Fourth Amendment.

Our holding today neither extends the *Carroll* doctrine nor broadens the scope of the permissible automobile search delineated in *Carroll, Chambers,* and *Ross.* It remains a "cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Mincey* v. *Arizona,* 437 U. S. 385, 390 (1978), quoting *Katz* v. *United States,* 389 U. S. 347, 357 (1967) (footnotes omitted). We held in *Ross:* "The exception recognized in *Carroll* is unquestionably one that is 'specifically established and well delineated.'" 456 U. S., at 825.

Until today, this Court has drawn a curious line between the search of an automobile that coincidentally turns up a container and the search of a container that coincidentally turns up in an automobile. The protections of the Fourth Amendment must not turn on such coincidences. We therefore interpret *Carroll* as providing one rule to govern all automobile searches. The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.

The judgment of the California Court of Appeal is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring in the judgment.

I agree with the dissent that it is anomalous for a briefcase to be protected by the "general requirement" of a prior warrant when it is being carried along the street, but for that same briefcase to become unprotected as soon as it is carried into an automobile. On the other hand, I agree with the Court that it would be anomalous for a locked compartment in an automobile to be unprotected by the "general requirement" of a prior warrant, but for an unlocked briefcase within the automobile to be protected. I join in the judgment of the Court because I think its holding is more faithful to the text and tradition of the Fourth Amendment, and if these anomalies in our jurisprudence are ever to be eliminated that is the direction in which we should travel.

The Fourth Amendment does not by its terms require a prior warrant for searches and seizures; it merely prohibits searches and seizures that are "unreasonable." What it explicitly states regarding warrants is by way of limitation upon their issuance rather than requirement of their use. See *Wakely* v. *Hart,* 6 Binney 316, 318 (Pa. 1814). For the warrant was a means of insulating officials from personal liability assessed by colonial juries. An officer who searched or seized without a warrant did so at his own risk; he would be liable for trespass, including exemplary damages, unless the jury found that his action was "reasonable." Amar, The Bill of Rights as a Constitution, 100 Yale L. J. 1131, 1178–1180 (1991); *Huckle* v. *Money,* 2 Wils. 205, 95 Eng. Rep. 768 (K. B. 1763). If, however, the officer acted pursuant to a proper warrant, he would be absolutely immune. See *Bell* v. *Clapp,* 10 Johns. 263 (N. Y. 1813); 4 W. Blackstone, Commentaries 288 (1769). By restricting the issuance of war-

rants, the Framers endeavored to preserve the jury's role in regulating searches and seizures. Amar, *supra;* Posner, Rethinking the Fourth Amendment, 1981 S. Ct. Rev. 49, 72–73; see also T. Taylor, Two Studies in Constitutional Interpretation 41 (1969).

Although the Fourth Amendment does not explicitly impose the requirement of a warrant, it is of course textually possible to consider that implicit within the requirement of reasonableness. For some years after the (still continuing) explosion in Fourth Amendment litigation that followed our announcement of the exclusionary rule in *Weeks* v. *United States,* 232 U. S. 383 (1914), our jurisprudence lurched back and forth between imposing a categorical warrant requirement and looking to reasonableness alone. (The opinions preferring a warrant involved searches of structures.) Compare *Harris* v. *United States,* 331 U. S. 145 (1947), with *Johnson* v. *United States,* 333 U. S. 10 (1948); compare *Trupiano* v. *United States,* 334 U. S. 699 (1948), with *United States* v. *Rabinowitz,* 339 U. S. 56 (1950). See generally *Chimel* v. *California,* 395 U. S. 752 (1969). By the late 1960's, the preference for a warrant had won out, at least rhetorically. See *Chimel; Coolidge* v. *New Hampshire,* 403 U. S. 443 (1971).

The victory was illusory. Even before today's decision, the "warrant requirement" had become so riddled with exceptions that it was basically unrecognizable. In 1985, one commentator cataloged nearly 20 such exceptions, including "searches incident to arrest . . . automobile searches . . . border searches . . . administrative searches of regulated businesses . . . exigent circumstances . . . search[es] incident to nonarrest when there is probable cause to arrest . . . boat boarding for document checks . . . welfare searches . . . inventory searches . . . airport searches . . . school search[es]. . . ." Bradley, Two Models of the Fourth Amendment, 83 Mich. L. Rev. 1468, 1473–1474 (footnotes omitted). Since then, we have added at least two more. *California* v. *Carney,* 471

U. S. 386 (1985) (searches of mobile homes); *O'Connor* v. *Ortega*, 480 U. S. 709 (1987) (searches of offices of government employees). Our intricate body of law regarding "reasonable expectation of privacy" has been developed largely as a means of creating these exceptions, enabling a search to be denominated not a Fourth Amendment "search" and therefore not subject to the general warrant requirement. Cf. *id.*, at 729 (SCALIA, J., concurring in judgment).

Unlike the dissent, therefore, I do not regard today's holding as some momentous departure, but rather as merely the continuation of an inconsistent jurisprudence that has been with us for years. Cases like *United States* v. *Chadwick*, 433 U. S. 1 (1977), and *Arkansas* v. *Sanders*, 442 U. S. 753 (1979), have taken the "preference for a warrant" seriously, while cases like *United States* v. *Ross*, 456 U. S. 798 (1982), and *Carroll* v. *United States*, 267 U. S. 132 (1925), have not. There can be no clarity in this area unless we make up our minds, and unless the principles we express comport with the actions we take.

In my view, the path out of this confusion should be sought by returning to the first principle that the "reasonableness" requirement of the Fourth Amendment affords the protection that the common law afforded. See *County of Riverside* v. *McLaughlin*, *ante*, at 60 (SCALIA, J., dissenting); *People* v. *Chiagles*, 237 N. Y. 193, 195, 142 N. E. 583 (1923) (Cardozo, J.). Cf. *California* v. *Hodari D.*, 499 U. S. 621, 624–627 (1991). I have no difficulty with the proposition that that includes the requirement of a warrant, where the common law required a warrant; and it may even be that changes in the surrounding legal rules (for example, elimination of the common-law rule that reasonable, good-faith belief was no defense to absolute liability for trespass, *Little* v. *Barreme*, 2 Cranch 170 (1804) (Marshall, C. J.); see generally Amar, Of Sovereignty and Federalism, 96 Yale L. J. 1425, 1486–1487 (1987)), may make a warrant indispensable to reasonableness where it once was not. But the supposed "gen-

eral rule" that a warrant is always required does not appear to have any basis in the common law, see, *e. g., Carroll, supra,* at 150–153; *Gelston* v. *Hoyt,* 3 Wheat. 246, 310–311 (1818) (Story, J.); *Wakely, supra,* and confuses rather than facilitates any attempt to develop rules of reasonableness in light of changed legal circumstances, as the anomaly eliminated and the anomaly created by today's holding both demonstrate.

And there are more anomalies still. Under our precedents (as at common law), a person may be arrested outside the home on the basis of probable cause, without an arrest warrant. *United States* v. *Watson,* 423 U. S. 411, 418–421 (1976); *Rohan* v. *Sawin,* 59 Mass. 281 (1851). Upon arrest, the person, as well as the area within his grasp, may be searched for evidence related to the crime. *Chimel* v. *California, supra,* at 762–763; *People* v. *Chiagles, supra* (collecting authority). Under these principles, if a known drug dealer is carrying a briefcase reasonably believed to contain marijuana (the unauthorized possession of which is a crime), the police may arrest him and search his person on the basis of probable cause alone. And, under our precedents, upon arrival at the station house, the police may inventory his possessions, including the briefcase, even if there is no reason to suspect that they contain contraband. *Illinois* v. *Lafayette,* 462 U. S. 640 (1983). According to our current law, however, the police may not, on the basis of the same probable cause, take the less intrusive step of stopping the individual on the street and demanding to see the contents of his briefcase. That makes no sense *a priori,* and in the absence of any common-law tradition supporting such a distinction, I see no reason to continue it.

\* \* \*

I would reverse the judgment in the present case, not because a closed container carried inside a car becomes subject to the "automobile" exception to the general warrant require-

ment, but because the search of a closed container, outside a privately owned building, with probable cause to believe that the container contains contraband, and when it in fact does contain contraband, is not one of those searches whose Fourth Amendment reasonableness depends upon a warrant. For that reason I concur in the judgment of the Court.

JUSTICE WHITE, dissenting.

Agreeing as I do with most of JUSTICE STEVENS' opinion and with the result he reaches, I dissent and would affirm the judgment below.

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, dissenting.

At the end of its opinion, the Court pays lipservice to the proposition that should provide the basis for a correct analysis of the legal question presented by this case: It is "'a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."' *Mincey* v. *Arizona,* 437 U. S. 385, 390 (1978), quoting *Katz* v. *United States,* 389 U. S. 347, 357 (1967) (footnotes omitted)." *Ante,* at 580.

Relying on arguments that conservative judges have repeatedly rejected in past cases, the Court today—despite its disclaimer to the contrary, *ibid.*—enlarges the scope of the automobile exception to this "cardinal principle," which undergirded our Fourth Amendment jurisprudence prior to the retirement of the author of the landmark opinion in *United States* v. *Chadwick,* 433 U. S. 1 (1977). As a preface to my response to the Court's arguments, it is appropriate to restate the basis for the warrant requirement, the significance of the *Chadwick* case, and the reasons why the limitations on the automobile exception that were articulated in *United States* v. *Ross,* 456 U. S. 798 (1982), represent a fair accom-

modation between the basic rule requiring prior judicial approval of searches and the automobile exception.

I

The Fourth Amendment is a restraint on Executive power. The Amendment constitutes the Framers' direct constitutional response to the unreasonable law enforcement practices employed by agents of the British Crown. See *Weeks* v. *United States*, 232 U. S. 383, 389–391 (1914); *Boyd* v. *United States*, 116 U. S. 616, 624–625 (1886); 1 W. LaFave, Search and Seizure 3–5 (2d ed. 1987). Over the years—particularly in the period immediately after World War II and particularly in opinions authored by Justice Jackson after his service as a special prosecutor at the Nuremburg trials—the Court has recognized the importance of this restraint as a bulwark against police practices that prevail in totalitarian regimes. See, *e. g.*, *United States* v. *Di Re*, 332 U. S. 581, 595 (1948); *Johnson* v. *United States*, 333 U. S. 10, 17 (1948).

This history is, however, only part of the explanation for the warrant requirement. The requirement also reflects the sound policy judgment that, absent exceptional circumstances, the decision to invade the privacy of an individual's personal effects should be made by a neutral magistrate rather than an agent of the Executive. In his opinion for the Court in *Johnson* v. *United States*, *id.*, at 13–14, Justice Jackson explained:

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."

Our decisions have always acknowledged that the warrant requirement imposes a burden on law enforcement. And our

cases have not questioned that trained professionals normally make reliable assessments of the existence of probable cause to conduct a search. We have repeatedly held, however, that these factors are outweighed by the individual interest in privacy that is protected by advance judicial approval. The Fourth Amendment dictates that the privacy interest is paramount, no matter how marginal the risk of error might be if the legality of warrantless searches were judged only after the fact.

In the concluding paragraph of his opinion in *Chadwick*, Chief Justice Burger made the point this way:

"Even though on this record the issuance of a warrant by a judicial officer was reasonably predictable, a line must be drawn. In our view, when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority. Respondents were therefore entitled to the protection of the Warrant Clause with the evaluation of a neutral magistrate, before their privacy interests in the contents of [their luggage] were invaded." 433 U. S., at 15–16.

In *Chadwick*, the Department of Justice had mounted a frontal attack on the warrant requirement. The Government's principal contention was that "the Fourth Amendment Warrant Clause protects only interests traditionally identified with the home." *Id.*, at 6. We categorically rejected that contention, relying on the history and text of the Amendment,[1] the policy underlying the warrant require-

---

[1] "Although the searches and seizures which deeply concerned the colonists, and which were foremost in the minds of the Framers, were those involving invasions of the home, it would be a mistake to conclude, as the Government contends, that the Warrant Clause was therefore intended to guard only against intrusions into the home. First, the Warrant Clause does not in terms distinguish between searches conducted in private homes and other searches. There is also a strong historical connection between

ment,[2] and a line of cases spanning over a century of our jurisprudence.[3]   We also rejected the Government's alternative argument that the rationale of our automobile search cases demonstrated the reasonableness of permitting warrantless searches of luggage.

We concluded that neither of the justifications for the automobile exception could support a similar exception for luggage.   We first held that the privacy interest in luggage is "substantially greater than in an automobile."   *Id.*, at 13. Unlike automobiles and their contents, we reasoned, "[l]uggage contents are not open to public view, except as a condition to a border entry or common carrier travel; nor is luggage subject to regular inspections and official scrutiny on a continuing basis."   *Ibid.*   Indeed, luggage is specifically intended to safeguard the privacy of personal effects, unlike an automobile, "whose primary function is transportation." *Ibid.*

We then held that the mobility of luggage did not justify creating an additional exception to the Warrant Clause.   Unlike an automobile, luggage can easily be seized and detained pending judicial approval of a search.   Once the police have

---

the Warrant Clause and the initial clause of the Fourth Amendment, which draws no distinctions among 'persons, houses, papers, and effects' in safeguarding against unreasonable searches and seizures."   *United States* v. *Chadwick*, 433 U. S., at 8.

[2] "The judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime.' *Johnson* v. *United States*, 333 U. S. 10, 14 (1948).   Once a lawful search has begun, it is also far more likely that it will not exceed proper bounds when it is done pursuant to a judicial authorization 'particularly describing the place to be searched and the persons or things to be seized.'   Further, a warrant assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search."   *Id.*, at 9.

[3] See *id.*, at 10–11.   The earliest case cited by Chief Justice Burger was Justice Field's opinion in *Ex parte Jackson*, 96 U. S. 727, 733 (1878).

luggage "under their exclusive control, there [i]s not the slightest danger that the [luggage] or its contents could [be] removed before a valid search warrant could be obtained. . . . With the [luggage] safely immobilized, it [i]s unreasonable to undertake the additional and greater intrusion of a search without a warrant" (footnote omitted). *Ibid.*

Two Terms after *Chadwick*, we decided a case in which the relevant facts were identical to those before the Court today. In *Arkansas* v. *Sanders*, 442 U. S. 753 (1979), the police had probable cause to search a green suitcase that had been placed in the trunk of a taxicab at the Little Rock Airport. Several blocks from the airport, they stopped the cab, arrested the passengers, seized the suitcase and, without obtaining a warrant, opened and searched it.

The Arkansas Supreme Court held that the search was unconstitutional. Relying on *Chadwick*, the state court had no difficulty in concluding that there was "nothing in this set of circumstances that would lend credence to an assertion of impracticability in obtaining a search warrant." *Sanders* v. *State*, 262 Ark. 595, 600, 559 S. W. 2d 704, 706 (1977). Over the dissent of JUSTICE BLACKMUN and then-JUSTICE REHNQUIST, both of whom had also dissented in *Chadwick*, this Court affirmed. In his opinion for the Court, Justice Powell noted that the seizure of the green suitcase was entirely proper,[4] but that the State nevertheless had the burden of justifying the warrantless search,[5] and that it had "failed to

---

[4] "Having probable cause to believe that contraband was being driven away in the taxi, the police were justified in stopping the vehicle, searching it on the spot, and seizing the suitcase they suspected contained contraband. See *Chambers* v. *Maroney*, [399 U. S. 42, 52 (1970)]. At oral argument, respondent conceded that the stopping of the taxi and the seizure of the suitcase were constitutionally unobjectionable. See Tr. of Oral Arg. 30, 44–46." *Arkansas* v. *Sanders*, 442 U. S., at 761–762.

[5] "[B]ecause each exception to the warrant requirement invariably impinges to some extent on the protective purpose of the Fourth Amendment, the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and 'the burden is on those

carry its burden of demonstrating the need for warrantless searches of luggage properly taken from automobiles." 442 U. S., at 763.

Chief Justice Burger wrote separately to identify the distinction between cases in which police have probable cause to believe contraband is located somewhere in a vehicle—the typical automobile exception case—and cases like *Chadwick* and *Sanders* in which they had probable cause to search a particular container before it was placed in the car. He wrote:

> "Because the police officers had probable cause to believe that respondent's green suitcase contained marihuana before it was placed in the trunk of the taxicab, their duty to obtain a search warrant before opening it is clear under *United States* v. *Chadwick*, 433 U. S. 1 (1977). The essence of our holding in *Chadwick* is that there is a legitimate expectation of privacy in the contents of a trunk or suitcase accompanying or being carried by a person; that expectation of privacy is not diminished simply because the owner's arrest occurs in a public place. Whether arrested in a hotel lobby, an airport, a railroad terminal, or on a public street, as here, the owner has the right to expect that the contents of his luggage will not, without his consent, be exposed on demand of the police. . . .
>
> "The breadth of the Court's opinion and its repeated references to the 'automobile' from which respondent's suitcase was seized at the time of his arrest, however, might lead the reader to believe—as the dissenters apparently do—that this case involves the 'automobile' exception to the warrant requirement. See *ante*, at 762–765, and n. 14. It does not. Here, as in *Chadwick*, it was the *luggage* being transported by respondent at

seeking the exemption to show the need for it.' *United States* v. *Jeffers*, 342 U. S. 48, 51 (1951)." *Id.*, at 759–760.

the time of the arrest, not the automobile in which it was being carried, that was the suspected locus of the contraband." 442 U. S., at 766–767 (opinion concurring in judgment).

Chief Justice Burger thus carefully explained that *Sanders*, which the Court overrules today, "simply d[id] not present the question of whether a warrant is required before opening luggage when the police have probable cause to believe contraband is located *somewhere* in the vehicle, but when they do *not* know whether, for example, it is inside a piece of luggage in the trunk, in the glove compartment, or concealed in some part of the car's structure." *Id.*, at 767. We confronted that question in *United States v. Ross*, 456 U. S. 798 (1982).[6]

We held in *Ross* that "the scope of the warrantless search authorized by [the automobile] exception is no broader and no narrower than a magistrate could legitimately authorize by warrant." See *id.*, at 825. The inherent mobility of the vehicle justified the immediate search without a warrant, but did not affect the scope of the search. See *id.*, at 822. Thus, the search could encompass containers, which might or might not conceal the object of the search, as well as the remainder of the vehicle. See *id.*, at 821.

Our conclusion was supported not only by prior cases defining the proper scope of searches authorized by warrant, as well as cases involving the automobile exception, but also by practical considerations that apply to searches in which the police have only generalized probable cause to believe that contraband is somewhere in a vehicle. We explained that, in such instances, "prohibiting police from opening immediately a container in which the object of the search is most likely to be found and instead forcing them first to comb the entire vehicle would actually exacerbate the intrusion on privacy in-

---

[6] In framing the question for decision we stated: "Unlike *Chadwick* and *Sanders*, in this case police officers had probable cause to search respondent's entire vehicle." 456 U. S., at 817.

terests." *Id.*, at 821, n. 28. Indeed, because "the police could never be certain that the contraband was not secreted in a yet undiscovered portion of the vehicle," the most likely result would be that "the vehicle would need to be secured while a warrant was obtained." *Ibid.*

These concerns that justified our holding in *Ross* are not implicated in cases like *Chadwick* and *Sanders* in which the police have probable cause to search a *particular* container rather than the *entire* vehicle. Because the police can seize the container which is the object of their search, they have no need either to search or to seize the entire vehicle. Indeed, as even the Court today recognizes, they have no authority to do so. See 456 U. S., at 824; *ante*, at 580.

In reaching our conclusion in *Ross*, we therefore did not retreat at all from the holding in either *Chadwick* or *Sanders*. Instead, we expressly endorsed the reasoning in Chief Justice Burger's separate opinion in *Sanders*. 456 U. S., at 813–814.[7] We explained repeatedly that *Ross* involved the *scope* of the warrantless search authorized by the automobile exception, *id.*, at 800, 809, 817, 825, and, unlike *Chadwick* and *Sanders*, did not involve the *applicability* of the exception to closed containers. 456 U. S., at 809–817.

Thus, we recognized in *Ross* that *Chadwick* and *Sanders* had not created a special rule for container searches, but

---

[7] Moreover, we quoted the following paragraph from Justice Powell's opinion concurring in the judgment in the intervening case of *Robbins* v. *California*, 453 U. S. 420 (1981):

"'[W]hen the police have probable cause to search an automobile, rather than only to search a particular container that fortuitously is located in it, the exigencies that allow the police to search the entire automobile without a warrant support the warrantless search of every container found therein. See *post*, at 451, and n. 13 (STEVENS, J., dissenting). This analysis is entirely consistent with the holdings in *Chadwick* and *Sanders*, neither of which is an 'automobile case,' because the police there had probable cause to search the double-locked footlocker and the suitcase respectively before either came near an automobile.'" *Id.*, at 435, quoted in *United States* v. *Ross*, 456 U. S. 798, 816 (1982).

rather had merely applied the cardinal principle that warrantless searches are *per se* unreasonable unless justified by an exception to the general rule. See 456 U. S., at 811–812.[8] *Ross* dealt with the scope of the automobile exception; *Chadwick* and *Sanders* were cases in which the exception simply did not apply.

## II

In its opinion today, the Court recognizes that the police did not have probable cause to search respondent's vehicle and that a search of anything but the paper bag that respondent had carried from Daza's apartment and placed in the trunk of his car would have been unconstitutional. *Ante*, at 580. Moreover, as I read the opinion, the Court assumes that the police could not have made a warrantless inspection of the bag before it was placed in the car. See *ibid*. Finally, the Court also does not question the fact that, under our prior cases, it would have been lawful for the police to seize the container and detain it (and respondent) until they obtained a search warrant. *Ante*, at 575. Thus, all of the relevant facts that governed our decisions in *Chadwick* and *Sanders* are present here whereas the relevant fact that justified the vehicle search in *Ross* is not present.

The Court does not attempt to identify any exigent circumstances that would justify its refusal to apply the general rule against warrantless searches. Instead, it advances these three arguments: First, the rules identified in the foregoing cases are confusing and anomalous. *Ante*, at 576–579. Second, the rules do not protect any significant interest in privacy. *Ante*, at 573–576. And, third, the rules impede effec-

---

[8] Although the Court today purports to acknowledge that the warrant requirement is the general rule, *ante*, at 580, it nonetheless inexplicably persists in referring to *Chadwick* and *Sanders* as announcing a "separate rule, unique to luggage and other closed packages, bags, and containers." *Ante*, at 571. Equally inexplicable is the Court's contention that, in overruling *Sanders*, it has not "extend[ed] the *Carroll* doctrine" that created the automobile exception. *Ante*, at 580.

tive law enforcement. *Ante,* at 576–577. None of these arguments withstands scrutiny.

### The "Confusion"

In the nine years since *Ross* was decided, the Court has considered three cases in which the police had probable cause to search a particular container and one in which they had probable cause to search two vehicles. The decisions in all four of those cases were perfectly straightforward and provide no evidence of confusion in the state or lower federal courts.

In *United States* v. *Place,* 462 U. S. 696 (1983), we held that, although reasonable suspicion justifies the temporary detention of an airline passenger's luggage, the seizure in that particular case was unreasonable because of the prolonged delay in ascertaining the existence of probable cause. In the course of our opinion, we noted that the then-recent decision in *Ross* had not modified the holding in *Sanders.* 462 U. S., at 701, n. 3. We also relied on *Chadwick* for our conclusion that the temporary seizure of luggage is substantially less intrusive than a search of its contents. 462 U. S., at 706–707.

In *Oklahoma* v. *Castleberry,* 471 U. S. 146 (1985), police officers had probable cause to believe the defendant carried narcotics in blue suitcases in the trunk of his car. After arresting him, they opened the trunk, seized the suitcases, and searched them without a warrant. The state court held that the search was invalid, explaining:

> "If the officer has probable cause to believe there is contraband somewhere in the car, but he does not know exactly where, he may search the entire car as well as any containers found therein. *See United States* v. *Ross,* 456 U. S. 798 . . . (1982); *Chambers* v. *Maroney,* 399 U. S. 42, . . . (1970); *Carroll* v. *United States,* 267 U. S. 132 . . . (1925). If, on the other hand, the officer only has probable cause to believe there is contraband in a

> specific container in the car, he must detain the container and delay his search until a search warrant is obtained. *See United States* v. *Ross*, 456 U. S. 798 . . . (1982); *Arkansas* v. *Sanders*, 442 U. S. 753 . . . (1979); *United States* v. *Chadwick*, 433 U. S. 1 . . . (1977)." *Castleberry* v. *State*, 678 P. 2d 720, 724 (Okla. 1984).

This Court affirmed by an equally divided Court. 471 U. S. 146 (1985).

In the case the Court decides today, the California Court of Appeal also had no difficulty applying the critical distinction. Relying on *Chadwick*, it explained that "the officers had probable cause to believe marijuana would be found only in a brown lunch bag and nowhere else in the car. We are compelled to hold they should have obtained a search warrant before opening it." 216 Cal. App. 3d 586, 592, 265 Cal. Rptr. 23, 27 (1990).

In the case in which the police had probable cause to search two vehicles, *United States* v. *Johns*, 469 U. S. 478 (1985),[9] we rejected the respondent's reliance on *Chadwick* with a straightforward explanation of why that case, unlike *Ross*, did not involve an exception to the warrant requirement. We first expressed our agreement with the Court of Appeals that the Customs officers who had conducted the search had

---

[9] In its discussion of the *Johns* case, the Court makes the puzzling statement that it "cannot see the benefit of a rule that requires law enforcement officers to conduct a more intrusive search in order to justify a less intrusive one." See *ante*, at 575. I assume that the Court does not mean to suggest that evidence found during the course of a search may provide the probable cause that justifies the search. Our cases have unequivocally rejected this bootstrap justification for a search which was not lawful when it commenced. See, *e. g.*, *United States* v. *Di Re*, 332 U. S. 581, 595 (1948); *Byars* v. *United States*, 273 U. S. 28, 29–30 (1927). Perhaps the Court fears that defendants will attempt similar *post hoc* reasoning and argue that, when the police have searched only a container rather than the whole car, they must have had probable cause only to search the container. If so, the Court's fear is unwarranted, for *Johns* itself foreclosed this argument. See 469 U. S., at 482–483.

probable cause to search the vehicles. *Id.*, at 482. We then explained:

> "Under the circumstances of this case, respondents' reliance on *Chadwick* is misplaced. . . . *Chadwick* . . . did not involve the exception to the warrant requirement recognized in *Carroll* v. *United States, supra*, because the police had no probable cause to believe that the automobile, as contrasted to the footlocker, contained contraband. See 433 U. S., at 11–12. This point is underscored by our decision in *Ross*, which held that notwithstanding *Chadwick* police officers may conduct a warrantless search of containers discovered in the course of a lawful vehicle search. See 456 U. S., at 810–814. Given our conclusion that the Customs officers had probable cause to believe that the pickup trucks contained contraband, *Chadwick* is simply inapposite. See 456 U. S., at 817." 469 U. S., at 482–483.

The decided cases thus provide no support for the Court's concern about "confusion." The Court instead relies primarily on predictions that were made by JUSTICE BLACKMUN in his dissenting opinions in *Chadwick* and *Sanders*.[10] The Court, however, cites no evidence that these predictions have in fact materialized or that anyone else has been unable to understand the "'inherent opaqueness,'" *ante*, at 579, of this uncomplicated issue. The only support offered by the Court, other than the unsubstantiated allegations of prior dissents, is three law review comments and a sentence from Professor LaFave's treatise. None of the law review pieces

---

[10] See *ante*, at 578–579 (referring to the undocumented prediction made by JUSTICE BLACKMUN, joined by then-JUSTICE REHNQUIST, in dissent in *Chadwick*); *ante*, at 579 (referring to the fact that the dissenters had "bemoaned the 'inherent opaqueness' of the difference between the *Carroll* and *Chadwick* principles and noted 'the confusion to be created for all concerned'").

criticize the holdings in *Chadwick* and *Sanders*.[11] The sentence from Professor LaFave's treatise, at most, indicates that, as is often the case, there may be some factual situations at the margin of the relevant rules that are difficult to decide. Moreover, to the extent Professor LaFave criticizes our jurisprudence in this area, he is critical of *Ross* rather than *Chadwick* or *Sanders*. And he ultimately concludes that even *Ross* was correctly decided. See 3 W. LaFave, Search and Seizure 55–56 (2d ed. 1987).

The Court summarizes the alleged "anomaly" created by the coexistence of *Ross*, *Chadwick*, and *Sanders* with the statement that "the more likely the police are to discover drugs in a container, the less authority they have to search it." *Ante*, at 577. This juxtaposition is only anomalous, however, if one accepts the flawed premise that the degree to which the police are likely to discover contraband is correlated with their authority to search *without a warrant*. Yet, even proof beyond a reasonable doubt will not justify a warrantless search that is not supported by one of the exceptions to the warrant requirement. And, even when the police have a warrant or an exception applies, once the police possess probable cause, the extent to which they are more or less certain of the contents of a container has no bearing on their authority to search it.

---

[11] One of the three pieces, Kamisar, The "Automobile Search" Cases: The Court Does Little to Clarify the "Labyrinth" of Judicial Uncertainty, in 3 The Supreme Court: Trends and Developments 1980–1981 (D. Opperman ed. 1982), was written prior to the decision in *Ross*. Moreover, rather than criticizing *Chadwick* and *Sanders*, the article expressly endorses Justice Brennan's refutation of the arguments advanced by JUSTICE BLACKMUN in his dissent in *Chadwick*. See Kamisar, *supra*, at 83–85. The other two articles were written shortly after *Ross*, and both criticize *Ross* rather than *Chadwick* or *Sanders*. See Gardner, Searches and Seizures of Automobiles and Their Contents: Fourth Amendment Considerations in a Post-*Ross* World, 62 Neb. L. Rev. 1 (1983); Latzer, Searching Cars and Their Contents, 18 Crim. L. Bull. 381 (1982).

To the extent there was any "anomaly" in our prior juris-
prudence, the Court has "cured" it at the expense of creating
a more serious paradox. For surely it is anomalous to pro-
hibit a search of a briefcase while the owner is carrying it ex-
posed on a public street yet to permit a search once the
owner has placed the briefcase in the locked trunk of his car.
One's privacy interest in one's luggage can certainly not be
diminished by one's removing it from a public thoroughfare
and placing it—out of sight—in a privately owned vehicle.
Nor is the danger that evidence will escape increased if the
luggage is in a car rather than on the street. In either loca-
tion, if the police have probable cause, they are authorized
to seize the luggage and to detain it until they obtain judicial
approval for a search. Any line demarking an exception to
the warrant requirement will appear blurred at the edges,
but the Court has certainly erred if it believes that, by
erasing one line and drawing another, it has drawn a clearer
boundary.

### The Privacy Argument

The Court's statement that *Chadwick* and *Sanders* provide
only "minimal protection to privacy," *ante*, at 576, is also un-
persuasive. Every citizen clearly has an interest in the pri-
vacy of the contents of his or her luggage, briefcase, handbag
or any other container that conceals private papers and ef-
fects from public scrutiny. That privacy interest has been
recognized repeatedly in cases spanning more than a century.
See, *e. g.*, *Chadwick*, 433 U. S., at 6–11; *United States* v.
*Van Leeuwen*, 397 U. S. 249, 251 (1970); *Ex parte Jackson*,
96 U. S. 727, 733 (1878).

Under the Court's holding today, the privacy interest that
protects the contents of a suitcase or a briefcase from a war-
rantless search when it is in public view simply vanishes
when its owner climbs into a taxicab. Unquestionably the
rejection of the *Sanders* line of cases by today's decision will
result in a significant loss of individual privacy.

To support its argument that today's holding works only a minimal intrusion on privacy, the Court suggests that "[i]f the police know that they may open a bag only if they are actually searching the entire car, they may search more extensively than they otherwise would in order to establish the general probable cause required by *Ross*." *Ante*, at 574–575. As I have already noted, see n. 9, *supra*, this fear is unexplained and inexplicable. Neither evidence uncovered in the course of a search nor the scope of the search conducted can be used to provide *post hoc* justification for a search unsupported by probable cause at its inception.

The Court also justifies its claim that its holding inflicts only minor damage by suggesting that, under *New York* v. *Belton*, 453 U. S. 454 (1981), the police could have arrested respondent and searched his bag if respondent had placed the bag in the passenger compartment of the automobile instead of in the trunk. In *Belton*, however, the justification for stopping the car and arresting the driver had nothing to do with the subsequent search, which was based on the potential danger to the arresting officer. The holding in *Belton* was supportable under a straightforward application of the automobile exception. See *Robbins* v. *California*, 453 U. S. 420, 449–453 (1981) (STEVENS, J., dissenting). I would not extend *Belton*'s holding to this case, in which the container—which was protected from a warrantless search before it was placed in the car—provided the only justification for the arrest. Even accepting *Belton*'s application to a case like this one, however, the Court's logic extends its holding to a container placed in the *trunk* of a vehicle, rather than in the passenger compartment. And the Court makes this extension without any justification whatsoever other than convenience to law enforcement.

## The Burden on Law Enforcement

The Court's suggestion that *Chadwick* and *Sanders* have created a significant burden on effective law enforcement

is unsupported, inaccurate, and, in any event, an insufficient reason for creating a new exception to the warrant requirement.

Despite repeated claims that *Chadwick* and *Sanders* have "impeded effective law enforcement," *ante*, at 574, 576, the Court cites no authority for its contentions. Moreover, all evidence that does exist points to the contrary conclusion. In the years since *Ross* was decided, the Court has heard argument in 30 Fourth Amendment cases involving narcotics.[12] In all but one, the government was the petitioner.[13] All save two involved a search or seizure without a warrant or with a defective warrant.[14] And, in all except three, the Court upheld the constitutionality of the search or seizure.[15]

---

[12] *Illinois* v. *Rodriguez*, 497 U. S. 177 (1990); *Florida* v. *Wells*, 495 U. S. 1 (1990); *United States* v. *Verdugo-Urquidez*, 494 U. S. 259 (1990); *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602 (1989); *Treasury Employees* v. *Von Raab*, 489 U. S. 656 (1989); *Florida* v. *Riley*, 488 U. S. 445 (1989); *Michigan* v. *Chesternut*, 486 U. S. 567 (1988); *California* v. *Greenwood*, 486 U. S. 35 (1988); *United States* v. *Dunn*, 480 U. S. 294 (1987); *Maryland* v. *Garrison*, 480 U. S. 79 (1987); *Colorado* v. *Bertine*, 479 U. S. 367 (1987); *California* v. *Ciraolo*, 476 U. S. 207 (1986); *United States* v. *Montoya de Hernandez*, 473 U. S. 531 (1985); *California* v. *Carney*, 471 U. S. 386 (1985); *United States* v. *Sharpe*, 470 U. S. 675 (1985); *United States* v. *Johns*, 469 U. S. 478 (1985); *New Jersey* v. *T. L. O.*, 469 U. S. 325 (1985); *United States* v. *Leon*, 468 U. S. 897 (1984); *United States* v. *Karo*, 468 U. S. 705 (1984); *Oliver* v. *United States*, together with *Maine* v. *Thornton*, 466 U. S. 170 (1984); *United States* v. *Jacobsen*, 466 U. S. 109 (1984); *Michigan* v. *Long*, 463 U. S. 1032 (1983); *Illinois* v. *Andreas*, 463 U. S. 765 (1983); *Illinois* v. *Lafayette*, 462 U. S. 640 (1983); *United States* v. *Place*, 462 U. S. 696 (1983); *United States* v. *Villamonte-Marquez*, 462 U. S. 579 (1983); *Illinois* v. *Gates*, 462 U. S. 213 (1983); *Texas* v. *Brown*, 460 U. S. 730 (1983); *Florida* v. *Royer*, 460 U. S. 491 (1983); *United States* v. *Knotts*, 460 U. S. 276 (1983).

[13] See *Treasury Employees* v. *Von Raab*, 489 U. S. 656 (1989).

[14] See *Maryland* v. *Garrison*, 480 U. S. 79 (1987); *Illinois* v. *Gates*, 462 U. S. 213 (1983).

[15] See *Florida* v. *Wells*, 495 U. S. 1 (1990); *United States* v. *Place*, 462 U. S. 696 (1983); *Florida* v. *Royer*, 460 U. S. 491 (1983).

In the meantime, the flow of narcotics cases through the courts has steadily and dramatically increased.[16] See Annual Report of the Attorney General of the United States 21 (1989). No impartial observer could criticize this Court for hindering the progress of the war on drugs. On the contrary, decisions like the one the Court makes today will support the conclusion that this Court has become a loyal foot soldier in the Executive's fight against crime.

Even if the warrant requirement does inconvenience the police to some extent, that fact does not distinguish this constitutional requirement from any other procedural protection secured by the Bill of Rights. It is merely a part of the price that our society must pay in order to preserve its freedom. Thus, in a unanimous opinion that relied on both *Johnson* and *Chadwick*, Justice Stewart wrote:

> "Moreover, the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment. Cf. *Coolidge* v. *New Hampshire*, [403 U. S. 443, 481 (1971)]. The investigation of crime would always be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law. See *United States* v. *Chadwick*, 433 U. S. 1, 6–11." *Mincey* v. *Arizona*, 437 U. S., at 393.

---

[16] The number of defendants charged with drug law violations who were convicted in federal courts increased 134% between 1980 and 1986. The corresponding increase in convictions for nondrug offenses was 27%. Bureau of Justice Statistics, Special Report, Drug Law Violators, 1980–86, p. 1 (June 1988). The percentage of drug cases dismissed by District Courts declined from 22.2% in 1980 to 13.8% in 1989. See Bureau of Justice Statistics, Federal Criminal Case Processing, 1980–87, Addendum for 1988 and Preliminary 1989, p. 12 (Nov. 1990).

It is too early to know how much freedom America has lost today. The magnitude of the loss is, however, not nearly as significant as the Court's willingness to inflict it without even a colorable basis for its rejection of prior law.

I respectfully dissent.